**NATIONAL ASSOCIATION OF BAS-KETBALL REFEREES, Plaintiff,**

v.

**Ed MIDDLETON, Michael Mathis, and Jack Nies, Defendants.**

**No. 87 CIV. 4421 (PKL).**

United States District Court,
S.D. New York.

July 18, 1988.

---

Markowitz & Richman, New York City (Richard H. Markowitz, of counsel), for plaintiff.

Frederick K. Brewington, New York City, for defendants.

## OPINION AND ORDER

LEISURE, District Judge:

This is a consolidated action brought by the National Association of Basketball Referees ("NABR"), a union representing the referees employed by the National Basketball Association ("NBA"). The three defendants are NBA referees, and all are union members. In this suit, the union is seeking to collect the defendants' share of a special assessment which was levied against all union members following a referendum of the union membership. The union claims that the assessment was levied in accordance with the NABR Constitution and Bylaws, and that the defendants are bound in contract to pay the monies owed. The union has moved for summary judgment. Defendants have cross-moved to dismiss the complaint, claiming that the Court lacks subject matter jurisdiction be-

cause no attempt has been made to use internal union procedures to resolve this dispute.

## I.

Most of the facts in this case are undisputed. In March 1984, the NABR membership voted to discharge the union's attorney, Richard G. Phillips, Esq. During the next two years, Phillips initiated four separate lawsuits against the NABR and its members. Several members of the NABR filed a fifth suit against the union, which sought, among other things, an injunction to restrain Phillips' discharge. The total claims against the union in the five lawsuits exceeded $600,000.[1] In the fall of 1986, Phillips and the Executive Board of the NABR began negotiations aimed at global settlement of all five pending lawsuits. At about the same time, Michael Mathis, a defendant in this action, resigned from his position as NABR Executive Director, and in September 1986, Hugh Evans assumed that position. A tentative settlement of the pending litigations was reached in December 1986, which provided for dismissal of all five actions. By the settlement's terms, the NABR agreed to pay Phillips a total of $510,000 in three installments. The union paid $150,000 to Phillips when the settlement was entered, and the parties agreed that the remaining $360,000 would be disbursed in installments of $150,000, $110,000 and $100,000.

The NABR Executive Board determined that the $360,000 should be raised by using $33,000 earned from an NABR contract with Converse, Inc.; $37,000 of membership dues owed from the 1986–87 season; and $290,000 from a special assessment of union members. Under the Executive Board's proposed special assessment, each individual union member's obligations would equal 5.4% of his NBA salary from 1983 to 1986. On December 19, 1986, the Executive Board sent each union member a notice labelled "Settlement of Pending Litigation and Notice of Referendum." Each member was also sent a ballot to vote on the proposed special assessment. Article XVI of the union's Constitution, in Sections 16.3 and 16.5, states that special assessments for extraordinary expenses are permitted.[2] Article XIII, in Section 13.2, allows referendum mail ballots to serve as a form of the secret ballot the Constitution requires for votes on such assessments. The ballots stated, in clearly visible capital letters, "DO NOT SIGN THIS BALLOT," and required immediate return to NABR Executive Director Evans at his home address. Of the thirty union members eligible to vote, twenty-one of the members voted for the assessment, seven voted against, and two did not cast ballots. Three members wrote comments on their ballots, and two of those three signed their first names. The twenty-five other ballots had no indication of name on them.

After the mail ballots were counted, members were notified of the assessment's approval. The Executive Board warned all union members at this time that the union would institute legal action to collect any unpaid assessments. Members' payments were due in three installments on the fifteenth day of March, April and June, 1987,

---

1. In Phillips' four suits, Phillips claimed he was entitled to $300,000 for negotiating a 1983–86 collective bargaining agreement; $185,000 for an agreement to retain him as counsel for five years; a $65,000 balance from a contract he had negotiated for the NABR with Converse, Inc.; and more than $20,000 in damages from a suit against five NABR members, alleging defamation and tortious interference with contractual and business relationships.

2. Article XVI, Section 16.3 states:
   Any general or special assessments shall be made in accordance with Section 16.5. Assessments shall be levied when extraordinary expenses are incurred. If such extraordinary expenses are based on the receipt by members of compensation, then assessments to pay for such extraordinary expenses shall be levied in a proportionate amount based on the amount received by each member.
   Article XVI, Section 16.5 provides, in part:
   A majority vote shall conclude the issue. Such vote shall be by secret ballot at a regular or special general membership meeting of the members in good standing then present, after reasonable notice of the intention to vote upon such matter, or by majority vote of the member in good standing voting in a membership referendum conducted by secret ballot, at the option of the Executive Board.

dates which corresponded to the dates set for settlement payments by the NABR to Phillips.

In March, the defendants failed to pay their first installments. The NABR Executive Board sent letters to the defendants, advising that legal action would be instituted if payments were not made within ten days. By June, defendants had still not made any payments, and defendants were the only members of the union not to have paid their assessments. Defendants Mathis, Middleton and Nies owed $10,039, $12,773 and $7,247 respectively. Following defendants' failure to pay their assessments, the NABR borrowed $40,000 to meet that portion of the union's litigation settlement obligations.

On June 24, 1987, the NABR commenced this action, and the NABR has now moved for summary judgment. Defendants, however, contend that the membership referendum approving the assessment was invalid because it violated the NABR Constitution's requirement that such a referendum be conducted by secret ballot. According to defendants, the ballot was not "secret" because the Executive Board conducted a telephone poll prior to the mailing of the ballots to union members, and because members' identities were revealed by return addresses on the envelopes in which the ballots were sent back to the Director of the Executive Board.

Defendants have also cross-moved to dismiss the complaint on grounds that even if the assessment is valid, the union has not pursued, nor have defendants been afforded the opportunity to pursue, resolution of the issues in this suit through internal union remedies. Article XII, Section 12.3(i), of the NABR Constitution provides that after a member has been charged with violating a provision of the Constitution, the member is entitled to a hearing before the Executive Board or before a Board appointed committee. If the member is not satisfied with the result of that hearing, he can appeal the Executive Board's decision to the general membership.[3]

## II.

Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides jurisdiction to federal courts to hear cases alleging violations of contracts between employers and labor organizations, or of contracts between labor organizations.[4] The Supreme Court has recognized that a union constitution is a "contract" as defined in § 301(a). *United Ass'n of Journeymen v. Local 334*, 452 U.S. 615, 621, 101 S.Ct. 2546, 2549–50, 69 L.Ed.2d 280 (1981) ("*Journeymen*"). Although the Supreme Court has held that § 301(a) provides a basis for jurisdiction in an action, brought by a local union against its parent international union, alleging a violation of the international union's constitution, the Supreme Court has not yet addressed whether an individual union member can sue his own union under § 301(a). *Id.*

Several lower courts, however, have extended the underlying rationale of the Supreme Court's opinion in *Journeymen* to

---

3. Article XII, Section 12.3(i) provides:

Charges may be filed against any member or officer for violation of any specific provision of the Constitution and Bylaws, or rules of order, or failure to perform any of the duties specified thereunder. Any such charges shall be specific, in writing and served upon the Executive Board and the members or officers involved. Any member or officer so charged shall be entitled to a reasonable time to prepare his defense and to a full and fair hearing in accordance with the essential requests of due process of law, as reasonably determined by the Executive Board or a Grievance Committee appointed by the Executive Board. The decision of the Executive Board may consist of reprimands, fines, suspensions, expulsion, or denials to hold office permanently or for a fixed period. In the event of a finding of guilty, the member or officer shall have the right to appeal said finding or the penalty imposed to the general membership at its next regularly scheduled meeting. The membership may reverse said guilty finding or penalty by a majority vote.

4. Section 301(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees ... or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

grant § 301(a) jurisdiction in suits brought by a union member against his or her union. For example, the Third Circuit has explained that "the congressional interests in insuring union accountability and achievement of labor stability, which were the bases for the holding in *Journeymen* that a local union could enforce the terms of a union constitution under section 301(a), are similarly furthered when an individual union member sues for enforcement of those terms." *Lewis v. International Broth. of Teamsters*, 826 F.2d 1310, 1313 (3rd Cir.1987). *See also Kinney v. International Broth. of Electrical Workers*, 669 F.2d 1222 (9th Cir.1987); *Grasty v. Amalgamated Clothing and Textile Workers*, 828 F.2d 123 (3rd Cir.1987); *Rodonich v. House Wreckers Union Local 95*, 624 F.Supp. 678 (S.D.N.Y.1985).

This case presents an uncommon situation where a *plaintiff* union has brought a suit against *defendant* union members under § 301(a). The alignment of the parties, though, is not determinative of whether jurisdiction exists under § 301(a), because the underlying issue of whether or not the union members breached the NABR's constitution, and owe the NABR money, could also have been raised in a suit by the union members themselves. *Cf. International Union v. Local Union No. 589*, 693 F.2d 666, 671 (7th Cir.1982) (since local union can bring suit under § 301(a) against international union, alleging violations of international union's constitution, it follows that § 301(a) affords jurisdiction over the international union's suit against [the local union], alleging violations of the international union's constitution). Thus, because this Court agrees that § 301(a) creates federal jurisdiction when a union member sues his or her union for breach of the union's constitution, it follows that § 301(a) jurisdiction exists in this suit by the NABR.

### III.

■ Defendants claim that plaintiff lacks standing because the NABR had not alleged an injury in fact.[5] Defendant is correct to assert that standing requires "demanding an injury in fact that has been caused by the challenged conduct and that can be remedied by a judicial decree." 13A C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 3531 (1984). When applying this standard to this case, plaintiff clearly has standing. The NABR alleged, in the complaints against the three defendants, that the union and general membership had become liable for the specific assessment amounts due, because of defendants failure to pay. The union alleges that it was, in fact, forced to take a $40,000 loan to meet its settlement obligations with Phillips. *See* Affidavit of Hugh Evans, sworn to on December 16, 1987 at ¶ 28. Plaintiff has alleged an injury which can be remedied by the Court, and, thus, has standing before this Court.

### IV.

■ Defendants have argued that even if jurisdiction exists under § 301(a), the Court should nonetheless dismiss this action because defendants have not had the opportunity to pursue, and plaintiff has not pursued, relief through internal union procedures. Under certain circumstances, an internal union resolution of intra-union disputes may be required prior to judicial intervention in such disputes, but even in such cases courts have the discretion to decide whether the pursuit of internal remedies is appropriate. *Clayton v. United Automobile Workers*, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). Even assuming that the discretionary rule requiring pursuit of internal remedies applies in a case such as this, however, the parties have not demonstrated the existence of any NABR internal procedure which could resolve the dispute between the parties. Defendants have referred to two provisions of the NABR constitution which guarantee pursuit of internal remedies prior to commencement of legal action, but both provisions are, in this case, inapplicable.

■ The first provision, Article XII, Section 12.3(i), refers to a union member's

---

**5.** Defendants also claim that plaintiff has failed to state a cause of action upon which relief can be granted, because plaintiff, allegedly, has not claimed to have suffered an injury.

rights to internal remedies once he has been "charged" by the union. *See* note 3, *supra* at p. 134. After being "charged", a member has the right to prepare a defense, have that defense reviewed by the Executive Board, and then have any adverse Executive Board decision reviewed in an appeal to the entire membership. Section 12.3(i) is not applicable here, however, because although the Constitution does not explicitly define the term "charge", under no possible reading of the Constitution have the defendants been "charged" here. Normally, the term "charge", would refer to a step taken against a particular union member who has violated a provision of the union's Constitution or failed to perform some duty thereunder. As commonly used, such a charge would involve some threat of discipline or other internal action to be taken against a member. This case does not involve such a "charge" against defendants, but rather involves an effort by the union to enforce an assessment levied upon all members following a vote of the entire union membership. That this distinction is real is reflected in the procedures for "charges", and for assessments, provided in the NABR Constitution. Section 12.3(i) provides that once a member is "charged", that member can have the "charge" reviewed by the Executive Board, followed by appeal to the general membership. Sections 16.3 and 16.5 similarly provide that if the Executive Board recommends a special assessment, that recommendation must be voted upon by the entire union membership. Thus, the same protection of a vote by the entire membership, afforded to union members who are "charged", is also afforded to the entire membership when the Executive Board seeks to impose a special assessment. The union's Constitution does not contemplate a *second* vote of the entire membership if one or more of the members does not want to pay a special assessment to which a majority of the membership has already assented. By arguing that the union's effort to collect the assessments should be considered a "charge", defendants are, in effect, claiming that their own challenge to the assessments entitles them to a second

hearing by the entire membership. Under defendants' theory, any time a union member would not want to pay an assessment adopted by vote of the entire membership, he could simply not pay the assessment, wait for a challenge by the union, and call that challenge a "charge". This is a result which is inconsistent with the provisions of Sections 16.3 and 16.5. Reading the Constitution as a whole, the internal remedy provided in Section 12.3(i), which defendants claim they have been denied, could not have been contemplated to apply to the situation here.

The defendants also claim that the plaintiff violated Article XII, Section 12.4(f) of the NABR Constitution because plaintiff itself did not pursue internal union remedies prior to instituting this action. Section 12.4(f) of the NABR Constitution provides, in relevant part:

*"Rights of Members"*

12.4(f) The right to institute an action in any court ... [p]rovided, however, that any member must exhaust reasonable hearing procedures within the Association before instituting any legal or administrative proceeding against the Association or any officer thereof.

By its terms, this provision applies only to union members. But even if this provision does require the union to pursue internal remedies, it is still the case, as discussed above, that the union Constitution does not provide any internal procedure which would provide a remedy for this dispute. It cannot be that even when no internal remedy exists, that some internal procedure which will not provide a remedy must be pursued prior to initiation of a lawsuit.

## V.

■ Summary judgment is appropriate when " 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). In evaluating a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Liberty Lobby*, 477 U.S. at 247–49, 106 S.Ct. at 2509–11 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. However, Rule 56 does not require that the moving party support its motion with affidavits or other similar materials which negate the opponent's claim. The "burden on the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, who "'must set forth specific facts showing that there is a genuine issue for trial.'" *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting Fed.R.Civ.P. 56(e)). Because the District Court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved in favor of either party,"—the nonmoving party must produce, at the summary judgment stage, "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted). In this case, while the plaintiff has satisfied its summary judgment burden, the defendants have failed to produce any evidence demonstrating the existence of any genuine issue of material fact for trial.

It is undisputed that the union may, after general union membership approval, levy special assessments upon its members to meet extraordinary expenses. It is also undisputed that the general membership can approve special assessments through referendum mail balloting under the supervision of the NABR's Executive Board. When the Executive Board sent the referendum mail ballot regarding the special assessment at issue here, the union members were fully aware of the terms of the settlement agreement, and voted for its approval by returning their ballots to the Executive Director of the NABR.

Defendants have made several claims challenging the referendum here. Defendants claim that the union's referendum to approve the assessment was invalid because 1) a telephone poll was conducted prior to the referendum mail ballot and 2) the referendum mail ballot required union members to place their return addresses on the envelopes, thus eliminating the secrecy required for voting by Article XVI, Section 16.5, of the union Constitution. Defendants also claim that plaintiff is not entitled to summary judgment because this claim has not yet been subject to internal union remedies.

Defendants, however, have not presented any evidence to the Court to substantiate these claims. By its very terms, Rule 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading,* but the adverse party's response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If

the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Fed.R.Civ.P. 56(e) (emphasis added). *See also Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505 (in response to a summary judgment motion, the nonmoving party must state specific facts which show that there is a genuine issue for trial).

The plaintiff has submitted an affidavit with its motion which suggested that the referendum ballot was indeed secret. *See* Affidavit of Hugh Evans, sworn to on December 16, 1987 at ¶¶ 17, 20. But defendants have provided no deposition testimony, affidavits, or other evidence to substantiate their claim that union members received telephone calls prior to the referendum mail ballot. Nor have defendants presented any evidence that union members placed their return addresses on the envelopes in which ballots were sent to the Executive Director. Most importantly, defendants have not supported their assertion that such return addresses in any way compromised the secrecy of the ballots enclosed in the envelopes.

Defendants' claim that the union itself should have pursued internal remedies also cannot defeat plaintiff's summary judgment motion. As noted above, no internal remedies exist for the claims here, and therefore the failure to pursue such remedies simply is not a material fact. This same analysis applies to defendants' final claim that the union deprived the defendants of the opportunity to pursue internal remedies. It is worth noting, however, that the defendants have also failed to substantiate this final claim. There is no evidence to suggest that the defendants even tried to pursue internal remedies. Indeed, defendants apparently made no effort to correspond with the Executive Board, or to the union members, to request a new vote or a hearing. The facts in the record indicate that defendants knew that legal action would proceed against them if payment of the assessments were not made. On at least four occasions, defendants were notified by letter, from the Executive Board or its attorney, that legal action would ensue for failure to make a payment. *See* PX A;

DX's C, D, and E. Yet, the only evidence before the Court suggests that defendants chose to withhold payments and wait for the NABR to commence legal action.

The Court is thus presented only with evidence of an assessment the general membership approved through legitimate and union-accepted voting procedures—an assessment which three union members, the defendants, refuse to pay. Defendants have failed to set forth facts to refute the validity of the vote. In the absence of such facts showing a genuine issue for trial, plaintiff's motion for summary judgment is granted.

### CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is granted and defendants' motion to dismiss is denied.

SO ORDERED.